**ORAL ARGUMENT SCHEDULED FOR JANUARY 11, 2021**
**No. 20-5088**

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

CENTER FOR BIOLOGICAL DIVERSITY,

*Plaintiff-Appellant*,

v.

DAVID BERNHARDT, DEPARTMENT OF THE INTERIOR,
AURELIA SKIPWITH, and
UNITED STATES FISH AND WILDLIFE SERVICE,

*Defendants-Appellees*.

On Appeal from the United States District Court
for the District of Columbia Case No. 1:18-cv-02576-RC

**PLAINTIFF-APPELLANT'S FINAL OPENING BRIEF**

Ryan Shannon
Telephone: (971) 717-6407
rshannon@biologicaldiversity.org
Center for Biological Diversity
P.O. Box 11374
Portland, OR 97211

Amy Atwood
Telephone: (971) 717-6401
atwood@biologicaldiversity.org
Center for Biological Diversity
P.O. Box 11374
Portland, OR 97211

*Attorneys for Plaintiff-Appellant*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

The following information is provided pursuant to Circuit Rules 28 and 26.1:

**A.    Parties:**

Appellant is the Center for Biological Diversity.

Appellees are David Bernhardt, in his official capacity as the Secretary of the Interior; the Department of the Interior; Aurelia Skipwith, Director of the U.S. Fish and Wildlife Service; and the U.S. Fish and Wildlife Service.

### 1.    Rule 26.1 Disclosure Statement

Corporate Appellant is a non-governmental organization that works through science, law, and creative media to secure a future for all species, great or small, hovering on the brink of extinction. Corporate Appellant is a 501(c)(3) non-profit organization that hereby states pursuant to Federal Rule of Appellate Procedure 26.1 that it has no parent companies, is not publicly traded, and that no publicly held company owns 10 percent or more of any of its stock.

**B.    Ruling Under Review**

Appellant seeks review of the order issued by the Honorable Judge Contreras of the United States District Court for the District of Columbia on February 12, 2020, granting the Appellees' motion to dismiss. *Center for Biological Diversity v. Bernhardt et al.*, Case No. 1:18-cv-02576-RC (ECF 27).

i

## C.    Related Cases

The case on review has not previously been before this Court and Appellant's counsel is unaware of any related cases pending before this Court or in any other court.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................v

GLOSSARY OF ACRONYMS AND ABBREVIATIONS ................................. ix

STATEMENT OF JURISDICTION ....................................................1

ADDENDUM .....................................................................1

STATEMENT OF ISSUES ..........................................................1

STATEMENT OF THE CASE.......................................................2

STATEMENT OF FACTS .........................................................4

    A.   STATUORY BACKGROUND: THE ENDANGERED SPECIES ACT....4

    B.   FACTUAL BACKGROUND: SPECIES STATUS ASSESSMENTS .......8

    C.   PROCEEDINGS BELOW ...............................................13

STANDARD OF REVIEW ........................................................13

SUMMARY OF ARGUMENT ....................................................14

ARGUMENT ...................................................................16

I.   THE SERVICE'S FAILURE TO PROVIDE NOTICE AND COMMENT ON
THE SPECIES STATUS ASSESSMENT PROGRAM'S IMPLEMENTING
GUIDELINES AS REQUIRED BY THE ESA HAS CAUSED THE CENTER
TO SUFFER A DEPRIVATION OF INFORMATION THAT MAY BE
REDRESSED BY JUDICIAL RELIEF............................................16

    A.   The Supreme Court and this Court have Long Recognized that the Denial
of Access to Information Required to be Published by Statute May
Constitute an "Informational Injury".......................................17

    B.   The Service's Failure to Provide Notice and Comment on the Species
Status Assessment Program's Implementing Guidelines Has Deprived the
Center of Information Section 4(h) of the ESA Requires the Service to
Disclose...................................................................18

    C.   Congress Intended to Protect Groups like the Center from the Harm
Caused by the Service's Failure to Provide Notice and Comment on the
Species Status Assessment Program's Implementing Guidelines When
Congress Promulgated Section 4(h) of the ESA ......................................22

D.    The Service's Failure to Provide Notice and Comment on the Species Status Assessment Program's Implementing Guidelines, Including the Framework, Continues to Injure the Center ..............................................29

E.    The Service's Failure to Provide Notice and Comment on the Species Status Assessment Program's Implementing Guidelines Caused the Center's Informational Injury and an Order from this Court Can Redress that Injury......................................................................................................32

II.    ALTERNATIVELY, THE SERVICE'S FAILURE TO PROVIDE NOTICE AND COMMENT ON THE SPECIES STATUS ASSESSMENT PROGRAM'S IMPLEMENTING GUIDELINES HAS INFLICTED ORGANIZATIONAL INJURY ON THE CENTER BY DEPRIVING IT OF KEY INFORMATION CRITICAL TO ITS MISSION AND REQUIRING IT TO EXPEND RESOURCES TO COUNTERACT THIS HARM ..................35

III.    THE CENTER'S ESA CITIZEN SUIT CLAIM CHALLENGES A DISCRETE, NON-DISCRETIONARY DUTY THAT THE SERVICE FAILED TO TAKE........................................................................................39

CONCLUSION .......................................................................................................43

iv

# TABLE OF AUTHORITIES

## CASES

*Am. Anti-Vivisection Soc'y v. USDA*,
  946 F.3d 615 (D.C. Cir. 2020) .................................................... 28, 37

*Am. Lands All. v. Norton*,
  242 F. Supp. 2d 1 (D.D.C. 2003) ........................................................21

*Am. Soc. For Prevention of Cruelty to Animals v. Feld Entm't Inc.*,
  659 F.3d 13 (D.C. Cir. 2011) .............................................................38

*Ams. For Safe Access v. DEA*,
  706 F.3d 438 (D.C. Cir. 2013) ...........................................................38

*Bennett v. Spear*,
  520 U.S. 154 (1997) ..........................................................................7

*Bowen v. Mass.*,
  487 U.S. 879 (1988) ........................................................................39

*Byrd v. U.S. EPA*,
  174 F.3d 239 (D.C. Cir. 1999) ...........................................................34

*Cobell v. Norton*,
  240 F.3d 1081 (D.C. Cir. 2001) .........................................................41

*Coos Cnty. Bd. of Cnty. Comm'rs v. Kempthorne*,
  531 F.3d 792 (9th Cir. 2008) .............................................................39

*EDF v. EPA*,
  922 F.3d 446 (D.C. Cir. 2019) ............................................. 16, 17, 22

*Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*,
  878 F.3d 371 (D.C. Cir. 2017) ...........................................................18

*Envtl. Def. Fund v. Ruckelshaus*,
  439 F.2d 584 (D.C. Cir. 1971) ...........................................................22

*Equal Rights Ctr. v. Post Props.*,
  633 F.3d 1136 (D.C. Cir. 2011) ................................................. 37, 38

*Ethyl Corp. v. EPA*,
  306 F.3d 1144 (D.C. Cir. 2002) ................................................. 17, 22

*FEC v. Akins*,
  524 U.S. 11 (1998) .................................................................. 17, 28

*Friends of Animals v. Bernhardt*,
    961 F.3d 1197 (D.C. Cir. 2020) ........................................................................37

*Friends of Animals v. Jewell*,
    824 F.3d 1033 (D.C. Cir. 2016) ........................................... 17, 20, 22, 25, 27, 32

*Friends of Animals v. Jewell*,
    828 F.3d 989 (D.C. Cir. 2016) ........................................................................18

*Friends of Blackwater v. Salazar*,
    691 F.3d 428 (D.C. Cir. 2012), *rev'g,* 772 F. Supp. 2d 232 (D.D.C. 2011) ........40

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982) ........................................................................28

*Info. Handling Servs. v. Def. Automated Printing Servs.*,
    338 F.3d 1024 (D.C. Cir. 2003) ........................................................................13

*Jackson v. Modly*,
    949 F.3d 763 (D.C. Cir. 2020) ........................................................................14

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ................................................... 14, 17, 27, 31, 33

*Nat'l Ass'n of Home Builders v. Norton*,
    415 F.3d 8 (D.C. Cir. 2005)........................................................... 41, 42

*Norton v. S. Utah Wilderness All.*,
    542 U.S. 55 (2004) ........................................................................39

*People for the Ethical Treatment of Animals v. USDA*,
    797 F.3d 1087 (D.C. Cir. 2015) ........................................... 28, 37, 38

*Pub. Citizen v. U.S. Dep't of Justice*,
    491 U.S. 440 (1989) ........................................................... 17, 26, 28

*Sierra Club v. Thomas*,
    828 F.2d 783 (D.C. Cir. 1987) ........................................................................41

*Spokeo, Inc. v. Robins*,
    136 S. Ct. 1540 (2016) ........................................................................18

*Tenn. Valley Auth. v. Hill*,
    437 U.S. 153 (1978) ........................................................................4

*Warth v. Seldin*,
    422 U.S. 490 (1975) ........................................................................14

*Waterkeeper All. v. EPA*,
    853 F.3d 527 (D.C. Cir. 2017) ........................................................................20

**STATUTES**

Administrative Procedure Act, 5 U.S.C. §§ 551–559, 701–706

5 U.S.C. § 704 ................................................................. 2, 15, 40

5 U.S.C. § 706(1) .......................................................................39

Endangered Species Act, 16 U.S.C. §§ 1531–1544 ..................................1

16 U.S.C. § 1533(a)(1).........................................................4, 5

16 U.S.C. § 1533(b)(1)(A).....................................................5, 24

16 U.S.C. § 1533(b)(3)(A) ....................................................5, 6

16 U.S.C. § 1533(b)(3)(B) .........................................................6

16 U.S.C. § 1533(b)(3)(B)(ii) ...................................................6

16 U.S.C. § 1533(b)(4)...............................................................42

16 U.S.C. § 1533(b)(6)(A) .........................................................6

16 U.S.C. § 1533(c)(2)(A) ........................................................10

16 U.S.C. § 1533(f)..................................................................4

16 U.S.C. § 1533(h) .............................. 2, 3, 7, 14, 16, 18, 20, 21, 35, 39, 40, 42

16 U.S.C. § 1533(h)(2)........................................................ 19, 25

16 U.S.C. § 1533(h)(4)..............................................................25

16 U.S.C. § 1536(a)(2)................................................................4

16 U.S.C. § 1538(a)...................................................................4

16 U.S.C. § 1539(c)............................................................. 20, 21

16 U.S.C. § 1540(c).................................................................1, 8

16 U.S.C. § 1540(g)(1)(C) .................................... 1, 7, 8, 39, 40, 41

16 U.S.C. § 1540(g)(2)(A)(i) ....................................................8

16 U.S.C. § 1540(g)(2)(C) ........................................................8

16 U.S.C. § 1540(g)(C)..............................................................39

28 U.S.C. § 1291 ......................................................................1

28 U.S.C. § 1331 ......................................................................1

Declaratory Judgments Act, 28 U.S.C. §§ 2201-2202 .............................1

**REGULATIONS**

50 C.F.R. § 402.01(b) ................................................................................5

## GLOSSARY OF ACRONYMS AND ABBREVIATIONS

| | |
|---|---|
| APA | Administrative Procedure Act, 5 U.S.C. §§ 551–559, 701–706 |
| ESA | Endangered Species Act, 16 U.S.C. §§ 1531–1544 |
| FOIA | Freedom of Information Act, 5 U.S.C. § 552 |
| Service | U.S. Fish and Wildlife Service |

## STATEMENT OF JURISDICTION

This Court has jurisdiction over this appeal under 28 U.S.C. § 1291. The

district court had jurisdiction over this matter pursuant to the ESA, 16 U.S.C. §

1540(c), (g)(1)(C), and 28 U.S.C. § 1331, and relief was requested under the ESA,

16 U.S.C. § 1540(g)(1)(C), and the Declaratory Judgments Act, 28 U.S.C.

§§ 2201–2202.

The final order disposing of all of Appellant's claims by granting the

Appellees' motion to dismiss below was issued on February 12, 2020. ECF 27.

This appeal was timely filed pursuant to Federal Rules of Appellate Procedure 3

and 4 and 28 U.S.C. § 1291 on April 10, 2020. Dkt. #1837827.

## ADDENDUM

Pertinent statutory provisions are set forth in the Addendum.

## STATEMENT OF ISSUES

This case concerns Plaintiff Center for Biological Diversity's ("Center")

claim that the U.S. Fish and Wildlife Service ("Service") failed to publish certain

information that the Endangered Species Act, 16 U.S.C. §§ 1531–1544 ("ESA" or

"Act") requires to be published. The district court dismissed the case on standing

grounds while also suggesting in a footnote that the Center needed to allege a final

agency action in order to pursue an ESA citizen suit claim. *See* ECF 27 (order

1

granting the Service's motion to dismiss); *see also* ECF 28 (accompanying opinion). The issues on appeal are:

1.    Has the Center adequately alleged that the Service's failure to publish certain information as required by the ESA deprived the Center, a nonprofit organization dedicated to the protection of endangered and threatened species, of information it is legally entitled to, thereby causing the Center an informational injury-in-fact?

2.    Alternatively, has the Center adequately alleged that it has organizational standing by virtue of Service's impairment of the Center's species-protection activities?

3.    Does the Administrative Procedure Act's ("APA") final agency action requirement, 5 U.S.C. § 704, bar the Center's ESA citizen suit claim challenging the Service's failure to take a discrete, non-discretionary action that the agency is required to take?

## STATEMENT OF THE CASE

This case concerns the Defendants', collectively the "Service," compliance with section 4(h) of the ESA, which provides that the Service "shall establish and publish in the Federal Register" certain "guidelines" bearing on the listing and recovery of endangered and threatened species. 16 U.S.C. § 1533(h). The Center contends that the guidelines by which "species status assessments"—documents

2

which now inform virtually every species-specific decision taken pursuant to the ESA—are developed, collectively referred to as the Service's species status assessment program's implementing guidelines ("Program"), constitute such "guidelines."[1] Nevertheless, despite their sweeping import for implementation of the Act, the Service has never published in the Federal Register, or provided an opportunity for comment on, these guidelines as mandated by section 4(h) of the ESA. *Id.*

The Service's failure to comply with this statutory mandate has deprived the Center of information that the ESA requires the agency to publish. In doing so, the Service has caused the Center to suffer an "informational injury," and has also significantly impaired the Center's ability to carry out its core mission of advocating for and protecting endangered and threatened species. Requiring the Service to rectify this error by providing notice of these guidelines and an opportunity for comment would redress the Center's injury. Thus, the Center has adequately alleged Article III standing and the district court's decision to the

---

[1] Because the Service has failed to provide notice of and the opportunity to comment on the guidelines by which species status assessments are developed, the Center is precluded at this point in the case from providing an exhaustive list of every such guideline. That is why the Center has referred to the collection of such guidelines as the "species status assessment program's implementing guidelines." However, as described in more detail below, the Center has identified specific guidelines that it alleges constitute guidelines subject to section 4(h)'s disclosure requirement.

3

contrary must be reversed. Furthermore, the Center has adequately pled that the Service failed to take a discrete action it was required to take pursuant to section 4(h) of the ESA.

## STATEMENT OF FACTS

### A.    STATUTORY BACKGROUND: THE ENDANGERED SPECIES ACT

More than 45 years after its enactment, the ESA remains the world's strongest biodiversity-protection law. *See Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180, 184 (1978). The Act sets forth a comprehensive statutory and regulatory scheme designed to halt and reverse species' trend toward extinction and to set them on the path to recovery. These protections include: (1) the affirmative duty in ESA section 7(a)(2) to ensure that federal actions are not likely to jeopardize any listed species' continued existence, 16 U.S.C. § 1536(a)(2); (2) the prohibition in section 9(a) against the unlawful "take" of endangered wildlife, *id*. § 1538(a); and (3) the mandate in section 4(f) to develop and implement a science-based "recovery plan" for each endangered or threatened species, *id*. § 1533(f). But to receive the ESA's protections, species must first be listed as "endangered" or "threatened", *id*. § 1533(a)(1).

Accordingly, section 4, which governs listings, is the gateway for imperiled wildlife to receive the ESA's substantive protections. Section 4(a) requires the

4

Service to list species as "endangered" or "threatened" because of any one or more of the following factors:

A.    the present or threatened destruction, modification, or curtailment of its  habitat or range;
B.    overutilization for commercial, recreational, scientific, or educational  purposes;
C.    disease or predation;
D.    the inadequacy of existing regulatory mechanisms; or
E.    other natural or manmade factors affecting its continued existence.

*Id.* § 1533(a)(1).[2] The Service must make this determination "solely on the basis of the best scientific and commercial data available." *Id*. § 1533(b)(1)(A).

Listing can occur by the Service's initiative, *id*., or as is typically the case, in response to a petition that is submitted to the Service pursuant to a detailed process in section 4(b) that allows interested persons to petition the Service to list a species as endangered or threatened. *Id.* § 1533(b)(3)(A). The listing petition process includes mandatory deadlines for publication of three agency decisions in response to listing petitions: (1) the 90-day finding; (2) the 12-month finding; (3) and within 12 months of a "warranted" 12-month finding, the final listing determination.

The "90-day finding" requires the Service, within 90 days of receipt of a listing petition "to the maximum extent practicable," publish a finding in the

_____

[2] The statutory text of the ESA refers to the "Secretary," who has delegated administration of the ESA to the Service. 50 C.F.R. § 402.01(b).

5

Federal Register as to whether a listing petition "presents substantial scientific or commercial information indicating that the petitioned action may be warranted." *Id.* If the Service determines that a petition presents substantial information indicating that listing "may be warranted," then the agency must publish that finding and proceed with a scientific review of the species' status, known as a "status review." *Id.*

Upon completion of the status review, and within 12 months from the date that it receives the petition, the Service "shall" make a finding with one of three determinations: (1) listing is "warranted"; (2) listing is "not warranted"; or (3) listing is "warranted but precluded" by pending proposals to list species, provided certain circumstances are present. *Id*. § 1533(b)(3)(B). This is known as a "12-month finding." If in the 12-month finding the Service concludes that listing is "warranted," then the agency must publish that finding in the Federal Register and a proposed regulation to list the species as endangered or threatened and solicit public comment on the proposal. *Id.* § 1533(b)(3)(B)(ii). Then, within one year of a proposed listing rule, the Service must publish the final listing rule. *Id*. § 1533(b)(6)(A). This is known as a "final listing determination."

In service to section 4's mandate to timely provide the Act's protections to imperiled species, section 4(h) mandates that the Service "shall establish, and publish in the Federal Register, agency guidelines to insure that the purposes of

6

[section 4] are achieved efficiently and effectively." *Id*. § 1533(h). Such agency

guidelines "shall" include "but are not limited to"—

> (1)    procedures for recording the receipt and the disposition of petitions    submitted under section (b)(3) of [section 4];
> (2)    criteria for making the findings required under such section with respect    to petitions;
> (3)    a ranking system to assist in the identification of species that should    receive priority review under section (a)(1) of [section 4]; and
> (4)    a system for developing and implementing, on a priority basis, recovery plans    under section    (f)    of    [section    4].

*Id*. Section 4(h) further mandates the Service provide "public notice of, and

opportunity to submit written comments on, any guideline (including any

amendment thereto) proposed to be established under this section." *Id*. The public

notice-and-comment requirements of section 4(h) serve both (1) to apprise and

inform the public of the guidelines for administering section 4, and (2) to solicit

public comment on such guidelines. Section 4(h) applies broadly to any agency

guidelines, draft guidelines, or amendments of previously promulgated guidelines.

*Id.*

     In order to ensure that the ESA's mandates are carried out, Congress

included a citizen suit provision that allows citizens to act as "private attorneys

general[s]," *Bennett v. Spear*, 520 U.S. 154, 165 (1997), and to bring suit against

the Service for any "alleged failure … to perform any act or duty" under section 4

of the ESA "which is not discretionary." 16 U.S.C. § 1540(g)(1)(C). This provision

7

provides federal district courts with jurisdiction to order the Service to perform any act or duty required by section 4, *id.*, sixty days after the Service receives written notice of an interested party's intent to sue. *Id.* § 1540(g)(2)(C); *see also id.* § 1540(c) ("The several district courts of the United States … shall have jurisdiction over any actions arising under [the ESA].").[3]

### B.    FACTUAL BACKGROUND: SPECIES STATUS ASSESSMENTS

The significance of species status assessments to the Service's implementation of the ESA cannot be overstated as they now inform nearly every decision taken by the Service pursuant to the Act. Am. Compl. ¶ 2 (ECF 14) [JA 7]. Despite their importance, however, the Service has never provided notice in the Federal Register of the guidelines by which species status assessments are generated or allowed the public to comment on these guidelines, as required by Section 4(h) for all "guidelines" implementing section 4. *Id.* ¶ 3 [JA 7-8].

The Service first began using species status assessments for individual species listing decisions and other decisions under the Act in 2012. *Id.* ¶¶ 42–43 [JA 17-18]. As the Service envisioned but did not disclose publicly at the time, these assessments would be developed by teams appointed by the Service who

---

[3] In compliance with 16 U.S.C. § 1540(g)(2)(A)(i), the Center provided formal notice of intent to file suit under the ESA's citizen suit provision more than 60 days prior to the filing of its Complaint. Am. Compl. ¶ 6 (ECF 14) [JA 8].

would compile what they considered to be the "best scientific data available" on individual species into a species status assessment. *Id*. [JA 17-18]; Ex. A (ECF 17-1) at 5 [JA 28]. These assessments, in turn, would then inform nearly every federal ESA decision for the species concerned including those made by the Service pursuant to section 4. Am. Compl. ¶¶ 42, 45 [JA 17, 18]; Ex. A at 5 [JA 28].[4] These include decisions on listing petitions, critical habitat designations, 5-year status reviews, the development of recovery plans, as well as many other decisions pursuant to other provisions in the Act. Am. Compl. ¶ 42 [JA 17].

In 2012, the agency also began drafting agency guidelines to govern the development of species status assessments, culminating in the development of the Species Status Assessment Framework ("Framework") in 2016. Am. Compl. ¶¶ 43–44 [JA 18]; Ex. A at 5 [JA 28] ("This document lays out the basic concepts in the … Framework and the minimum requirements for a [species status assessment]."); Am. Compl. ¶ 46 [JA 18]. And while the Service declared the Framework to be the guideline for developing species status assessments, the Service did not subject the Framework to a public notice-and-comment process in accordance with section 4(h). Am. Compl. ¶¶ 43–44 [JA 18].

---

[4] The Center's citations to Ex. A track the pdf page numbers of Exhibit A itself, and not the internal page numbers of the Framework.

Because of this failure, even now, after the release of numerous species status assessments, key questions about the Framework, the development of species status assessments, and their role within the Service's decision-making process, remain unanswered. For instance, the Service has never publicly disclosed, explained, or subjected to public notice and comment the policy objectives, processes, and standards for collecting and synthesizing what the Service has declared to be the "best scientific data available" about particular species in species status assessments. *Id.* ¶ 50 [JA 19-20]. Similarly, the Service has never provided the public with notice of how species status assessments interact with other statutory requirements such as obligatory "5-year reviews" of the status of listed species. *See* 16 U.S.C. § 1533(c)(2)(A); *see also* Lopez Decl. ¶ 6 (ECF 19-2) [JA 57-58] (noting confusion regarding whether "[the Service] was engaging in a 5-year review of the species' status …, a species status assessment …, or some other review based upon a petition or other data available to the Service").

This lack of information has engendered public confusion, particularly in connection with Service decisions on listing petitions. Greenwald Decl. ¶¶ 9–12 (ECF 19-1) [JA 51-53]; Lopez Decl. ¶¶ 6–8 [JA 57-58]. For example, one of the Service's first applications of such a species status assessment culminated in a 12-month finding for the Rio Grande cutthroat trout in 2014. Greenwald Decl. ¶ 9 [JA

10

51-52]; Am. Compl. ¶ 43 [JA 18]. The Center had been advocating for ESA

protection for the trout since it formally petitioned the Service to protect the trout

in 1998. Greenwald Decl. ¶ 9 [JA 51-52]. Yet it was not until 2008, a decade later,

that the Service determined the trout warranted protection. *Id.* [JA 51-52].

Nevertheless, rather than issue a proposed listing rule, the Service added the

imperiled trout to a growing list of "candidate" species, i.e., species that the agency

determined warrant protection, but which have not yet received listing

determinations. *Id.* [JA 51-52]. The trout's legal status languished in this

bureaucratic no-man's land for six more years, until 2014 when—in accordance

with a 2011 settlement agreement—the Service was required to finally list the

species or withdraw it from the list of candidates, at which point the Service

reversed its own prior determinations and denied protection to the species in a "not

warranted" 12-month finding. *Id.* [JA 51-52]; Order Granting Joint Motion for

Approval of Settlement Agreement and Order of Dismissal of Center for

Biological Diversity's Claims, *In Re: Endangered Species Act Section 4 Deadline

Litigation*, No. 1:10-mc-00377-EGS, MDL No. 2165 (D.D.C. Sept. 9, 2011) (ECF

No. 56).

The Service's "not warranted" finding was purportedly based on what the

agency had deemed to be the "best available scientific data" contained in a species

status assessment. Greenwald Decl.¶¶ 9–10 [JA 51-52]; Am. Compl. ¶ 43 [JA 18].

11

However, in the absence of public notice about the then developing Program, the Center was unaware—until after the final "not warranted" finding was made—that a species status assessment was being utilized in connection with the Service's decisions regarding the Center's petition to list the Rio Grande cutthroat trout. Greenwald Decl. ¶ 10 [JA 52]. Nor did the Center have any information on how the trout's species status assessment was being developed or how the Center could participate in its development by providing scientific information critical to the Service's ultimate listing decision. *Id.* ¶¶ 10, 16 [JA 52, 54]. Consequently, this lack of information effectively precluded the Center from gaining critical information about or informing its members about the trout's species status assessment, or informing the Service's own development of the species status assessment for the trout, and ultimately, the agency's decisions on the Center's petition to list the species under the ESA. *Id.* ¶¶ 9–10 [JA 51-52]. In doing so, the Center's ability to carry out its mission and to protect the Rio Grande cutthroat trout was significantly impaired.

This is just one example of how the Service's failure to provide information about the guidelines by which species status assessments are developed has negatively impacted the Center. Unfortunately, confusion around the Program remains to this day and continues to impact the Center's ability to effectively advocate for protections for imperiled species. *See, e.g.*, Lopez Decl. ¶¶ 6–7 [JA

12

57-58] (detailing confusion surrounding the development of a species status

assessment for the endangered Key deer and its 5-year status review).

### C.     PROCEEDINGS BELOW

To remedy the Service's ongoing failure to provide public notice of and the

opportunity to comment on the guidelines by which species status assessments are

developed, as mandated by section 4(h) of the ESA, the Center filed this case on

November 8, 2018. ECF 1 [JA 3]. On February 12, 2020, the district court granted

the Service's motion to dismiss. ECF 27 [JA 65]. While acknowledging that the

Center had adequately alleged that at least the Framework constituted a guideline

subject to section 4(h)'s publication requirements, the district court held that the

Center had not alleged sufficient facts to support Article III standing. ECF 28 at

10–27 [JA 75-92]. The court did not squarely resolve the government's alternative

argument that the Center had failed to challenge a final agency action, but

indicated in a footnote that it was inclined to agree with that argument. *Id*. at 26

n.15 [JA 91].

### STANDARD OF REVIEW

This Court "review[s] the district court's grant of [the Service's Fed. R. Civ.

P. 12(b)(1)] motion to dismiss for lack of standing de novo." *Info. Handling Servs.*

*v. Def. Automated Printing Servs.*, 338 F.3d 1024, 1029 (D.C. Cir. 2003). In doing

so, this Court "must accept as true all material allegations of the complaint, and

must construe the complaint in favor of the complaining party." *Warth v. Seldin*, 422 U.S. 490, 501 (1975).[5] The same standard applies if reviewing a dismissal for failure to state a claim under Fed. R. Civ. P. 12(b)(6). *Jackson v. Modly*, 949 F.3d 763, 767 (D.C. Cir. 2020). Additionally, "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss," this Court must "presum[e] that general allegations embrace those specific facts that are necessary to support the claim." *Lujan v. Defs. of Wildlife* ("*Defenders of Wildlife*"), 504 U.S. 555, 561 (1992).

## SUMMARY OF ARGUMENT

The Center's First Claim for Relief (and the only one on appeal), brought pursuant to the ESA's citizen suit provision, alleges that the Service deprived the Center of information that section 4(h) of the ESA requires the agency to publish; namely notice of the guidelines by which species status assessments are developed in order to ensure the "efficient" implementation of the agency's duties under section 4 of the ESA. *See* 16 U.S.C. § 1533(h) ("The Secretary shall establish, and publish in the Federal Register, agency guidelines to insure that the purposes of

---

[5] In addition, a plaintiff may be allowed "by amendment to the complaint or by affidavits," to provide "further particularized allegations of fact deemed supportive of plaintiff's standing." *Warth*, 422 U.S. at 501. Here, Plaintiffs relied on Declarations, ECF 19-1 & 19-2, in addition to the allegations in their Amended Complaint, ECF 14, to establish standing at the motion to dismiss stage.

14

[section 4 of the ESA] are achieved efficiently and effectively."); *see also* Ex. A at 5, 8 [JA 28, 31] (stating that the Framework will help "deliver the foundational science for informing all [ESA] decisions," in particular by streamlining the information used in ESA decisions, resulting in both "efficiency … and conservation effectiveness"). In doing so, the Service deprived the Center of information critical to the Center's mission of conserving and protecting imperiled species that Congress required the agency to disclose. This deprivation of the Center's statutory right to certain information has caused the Center to suffer an "informational injury." This alone is sufficient to hold that the Center has adequately alleged standing at the motion to dismiss stage.

The Service's violation of the discrete, non-discretionary duty imposed by section 4(h) has also impaired the Center's ability to carry out its mission to save species at risk of extinction (including the Center's ability to effectively petition for the inclusion of species on the list of endangered and threatened species). The district court may redress these injuries by providing both declaratory and injunctive relief pursuant to the ESA and the Declaratory Judgments Act. As such, the Center has Article III standing to bring this suit. The Center's ESA citizen suit claim is also adequately pled and is not barred by the APA's final agency action requirement. *See* 5 U.S.C. § 704.

15

## ARGUMENT

I.  **THE SERVICE'S FAILURE TO PROVIDE NOTICE AND COMMENT ON THE SPECIES STATUS ASSESSMENT PROGRAM'S IMPLEMENTING GUIDELINES AS REQUIRED BY THE ESA HAS CAUSED THE CENTER TO SUFFER A DEPRIVATION OF INFORMATION THAT MAY BE REDRESSED BY JUDICIAL RELIEF.**

The Center has adequately alleged that the Service's failure to provide notice of and an opportunity to comment on the guidelines by which species status assessments are developed, including the Framework, has deprived the Center of information that section 4(h) of the ESA requires the Service to disclose, and that this information would undoubtedly help the Center successfully pursue its mission to protect imperiled species. *See EDF v. EPA*, 922 F.3d 446, 452 (D.C. Cir. 2019) (finding that "[t]he law is settled that a denial of access to information qualifies as an injury in fact where a statute (on the claimants' reading) requires that the information be publicly disclosed and there is no reason to doubt their claim that the information would help them") (internal quotation marks and citations omitted); *see also* 16 U.S.C. § 1533(h). A court order declaring that the Service violated section 4(h) and requiring the agency to publish the Program's implementing guidelines in the Federal Register and provide an opportunity for comment on those guidelines would redress this injury. Thus, at this early stage of these proceedings where the Center is only required to plead "general factual

allegations of injury resulting from the [D]efendant[s'] conduct," *Defenders of Wildlife*, 504 U.S. at 561, the Center has carried its burden to "demonstrate that it has suffered a concrete and particularized injury in fact that is both fairly traceable to the EPA's action and likely to be redressed by a favorable judicial decision." *EDF*, 922 F.3d at 452 (citing *Defenders of Wildlife*, 504 U.S. at 560–561).

### A. The Supreme Court and this Court have Long Recognized that the Denial of Access to Information Required to be Published by Statute May Constitute an "Informational Injury."

As this Court has recognized, "[t]he law is settled that 'a denial of access to information' qualifies as an injury in fact 'where a statute (on the claimants' reading) requires that the information 'be publicly disclosed' and there 'is no reason to doubt their claim that the information would help them.'" *EDF*, 922 F.3d at 452 (quoting *Friends of Animals v. Jewell* ("*Friends of Animals I*"), 824 F.3d 1033, 1040–1041 (D.C. Cir. 2016) and *Ethyl Corp. v. EPA*, 306 F.3d 1144, 1148 (D.C. Cir. 2002); citing *FEC v. Akins*, 524 U.S. 11, 21 (1998)); *see also Pub. Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 449 (1989) (holding that failure to obtain information subject to disclosure under Federal Advisory Committee Act "constitutes a sufficiently distinct injury to provide standing to sue"). However, "[t]he nature of the second part of the inquiry may depend on the nature of the statutory disclosure provision at issue," and, in some instances, a plaintiff must show that "it suffers, by being denied access to that information, the type of harm

17

Congress sought to prevent by requiring disclosure." *Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity* ("*EPIC*"), 878 F.3d 371, 378 (D.C. Cir. 2017) (quoting *Friends of Animals v. Jewell* ("*Friends of Animals II*"), 828 F.3d 989, 992 (D.C. Cir. 2016); citing *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1549 (2016)).

### B. The Service's Failure to Provide Notice and Comment on the Species Status Assessment Program's Implementing Guidelines Has Deprived the Center of Information Section 4(h) of the ESA Requires the Service to Disclose.

Regarding the first part of this inquiry—based on the Center's interpretation of section 4(h) of the ESA which the district court agreed with below, ECF 28 at 12–14, and the Service did not refute—the Service has deprived the Center of information on the guidelines by which species status assessments are developed that the Service was required to provide pursuant to the discrete, non-discretionary duty Congress imposed on the agency in section 4(h) of the ESA, 16 U.S.C. § 1533(h). As noted above, section 4(h) mandates that the Service "establish, and publish in the Federal Register, agency guidelines to insure that the purposes of [section 4] are achieved efficiently and effectively." *Id*. § 1533(h). Section 4(h) further mandates the Service provide "public notice of, and opportunity to submit written comments on, any guideline (including any amendment thereto) proposed to be established under this section." *Id*. Although the ESA does not define the

term "guidelines," instead offering a non-exhaustive list including "criteria for making the findings required [under section (b)(3) of section 4 of the ESA] with respect to petitions," to add species to the list of endangered or threatened species, *id.* § 1533(h)(2), Merriam-Webster defines "guideline" as "an indication or outline of policy or conduct." *Guideline*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/guideline (last visited August 3, 2020).

One example of a guideline subject to section 4(h) is the Framework, which was developed "to assess the species['] biological status for the purpose of informing decisions and activities under the [ESA]," and lays out "the minimum requirements for a[ species status assessment]," which then "inform[s] all [ESA] decisions." Ex. A at 2, 5 [JA 25, 28]; *see also id.* at 8 [JA 31] ("The purpose of the … Framework is to provide a consistent, integrated, conservation-focused, and scientifically robust approach to assessing a species' biological status such that the information and analysis are useful to all decisions and activities under the ESA."). By setting forth the minimum requirements for Service employees when developing species status assessments, the Framework is clearly an "indication or outline of policy or conduct," and thus constitutes a "guideline."

Additionally, the Center has adequately alleged that the Framework is subject to section 4(h)'s disclosure requirement because the Framework was adopted "to insure that the purposes of [section 4 of the ESA] are achieved

19

efficiently and effectively." 16 U.S.C. § 1533(h). The Service stated that the Framework will help "deliver the foundational science for informing all [ESA] decisions," by streamlining the information used in ESA decisions, resulting in both "*efficiency* … and conservation *effectiveness*." Ex. A at 5, 8 [JA 28, 31] (emphasis added). Therefore, since the Framework is a "guideline" whose purpose is "to insure that the purposes of [section 4 of the ESA] are achieved *efficiently* and *effectively*," 16 U.S.C. § 1533(h) (emphasis added), the Service was required to provide notice and an opportunity for comment on it pursuant to section 4(h) of the ESA.[6] *Id.*

Notably, section 4(h) is not the only provision of the ESA that creates a statutory right to information as this Court recently held that section 10(c) of the ESA also "creates a right to information upon which a claim of informational standing may be predicated." *Friends of Animals I*, 824 F.3d at 1041; 16 U.S.C. § 1539(c). Specifically, the Court found that section 10(c) provides a right to

---

[6] It is immaterial at this early phase whether the Framework ultimately legally constitutes a "guideline." 16 U.S.C. § 1533(h). The Center has adequately pled the facts necessary to support a claim on the merits in its favor, i.e., that the Service was required yet failed to provide notice of and an opportunity for comment on the Framework pursuant to the ESA. *See Waterkeeper All. v. EPA*, 853 F.3d 527, 533 (D.C. Cir. 2017) (noting "the longstanding rule that for standing purposes we assume the merits in favor of the plaintiff").

20

information received by the Service in connection with applications to "take"

species pursuant to section 10 of the Act. *Id.*

Section 10(c)'s publication requirement is analogous to the requirement in

section 4(h).[7] If anything, the right to information in section 10(c) is less stringent

because section 4(h) contains no waiver to the requirement for notice and an

opportunity for comment. *Compare id.* § 1533(h) with *id.* § 1539(c) (allowing the

Service to waive notice-and-comment "in an emergency situation where the health

or life of an endangered animal is threatened and no reasonable alternative is

available to the applicant"). Additionally, section 4(h) mandates "the publication of

the actual guidelines established by the Secretary and not just a notice of their

availability." *Am. Lands All. v. Norton*, 242 F. Supp. 2d 1, 13 (D.D.C. 2003). Thus,

answering the first prong of whether the Center has adequately alleged an

informational injury, section 4(h) "requires that the information be publicly

---

[7] Section 10(c) of the Act provides:

> The Secretary shall publish notice in the Federal Register of each
> application for an exemption or permit which is made under this
> section. Each notice shall invite the submission from interested parties,
> within thirty days after the date of the notice, of written data, views, or
> arguments with respect to the application …. Information received by
> the Secretary as a part of any application shall be available to the public
> as a matter of public record at every stage of the proceeding.

16 U.S.C. § 1539(c).

21

disclosed." *EDF*, 922 F.3d at 452 (internal quotation marks and citation omitted). And when Congress vests in the public a right to notice and comment, that "procedure may not lightly be sidestepped" by the Service. *See Envtl. Def. Fund v. Ruckelshaus*, 439 F.2d 584, 594 (D.C. Cir. 1971).

### C. Congress Intended to Protect Groups like the Center from the Harm Caused by the Service's Failure to Provide Notice and Comment on the Species Status Assessment Program's Implementing Guidelines When Congress Promulgated Section 4(h) of the ESA.

Regarding the second part of the inquiry, "there is no reason to doubt" that access to the information that would be provided by notice and comment on the guidelines by which species status assessments are developed, including the Framework, would help the Center's work to "protect native wildlife and plants and their habitats." *Friends of Animals I*, 824 F.3d at 1041 (quoting *Ethyl Corp.*, 306 F.3d at 1148); Am. Compl. ¶ 8 [JA 9]; *see also* Greenwald Decl. ¶¶ 2, 4–6, 8–12, 15–19 [JA 49-55]; Lopez Decl. ¶¶ 6–8, 12–13 [JA 57-59]. The Center's mission is to work "through science, law, and creative media to secure a future for all species, great or small, hovering on the brink of extinction." Am. Compl. ¶ 8 [JA 9]; Greenwald Decl. ¶¶ 4–5 [JA 50]. In pursuit of that mission, the Center engages in many actions, including submitting petitions for species to be added to the Act's list of endangered and threatened species, advocating for the designation of critical habitat, and pressing for strong, science-based recovery plans. Am.

Compl. ¶ 10 [JA 9]; *see also* Greenwald Decl. ¶¶ 1, 8 [JA 49, 51]; Lopez Decl. ¶ 5

[JA 57].

       Defendants' violations of section 4(h)'s notice-and-comment requirements,

however, harm the Center's ability to carry out its mission because they deprive

the Center of information regarding the guidelines pursuant to which the Service

develops the species status assessments that provide "the foundational science for

informing *all* [ESA] decisions," including those that go to the heart of the Center's

mission. Ex. A. at 5 [JA 28] (emphasis added); Greenwald Decl. ¶¶ 15–19 [JA 53-

55]. For instance, the lack of information regarding the Framework and how it is

implemented to develop species status assessments harms the Center by

"preclud[ing it] from knowing how the Service informs its ESA decisions made

under section 4 of the Act, … including listing and critical habitat decisions made

in response to petitions that have been submitted by the Center and others, and the

Service's development and implementation, on a priority basis, of recovery plans."

Am. Compl. ¶ 12 [JA 10]; *see also* Greenwald Decl. ¶¶ 2, 9–19 [JA 49-55]; Lopez

Decl. ¶¶ 6–13 [JA 57-59]. "Defendants' failure also precludes the Center … from

understanding the underlying policy objectives, terms, and criteria of the

[P]rogram, and further affects the Center's … understanding of how the Service

compiles, synthesizes, reviews, distributes, or updates the information that will be

used to aid all ESA decisions that the agency makes." Am. Compl. ¶ 12 [JA 10];
*see also* Greenwald Decl. ¶¶ 2, 9–19 [JA 49-55]; Lopez Decl. ¶¶ 6–13 [JA 57-59].

Had the Service adhered to its statutory obligations, the Center would have
been notified and informed of the Framework, would have had the opportunity to
submit comments on it prior to its implementation in species-specific decisions,
and would have provided comments in order to help ensure the Framework's
consistency with the purposes of the ESA and the statutory obligations imposed on
the Service. Am. Compl. ¶ 14 [JA 11]; Greenwald Decl. ¶¶ 15–19 [JA 53-55].
Furthermore, the Center could have received clarification on many of its concerns
about the Framework, such as the make-up and qualifying criteria for species status
assessment team members and the process for assembling specific data; how and
whether the meetings of species status assessment teams will be consistent or
transparent; what the interested public can expect from species status assessment
team decisions; how the interested public may submit relevant information and if,
when, and how that information will be considered or incorporated; or how the
Service will ensure that species-specific decisions are based "solely on the basis of
the best scientific and commercial data." 16 U.S.C. § 1533(b)(1)(A); *see also* Am.
Compl. ¶ 50 [JA 19-20]; Greenwald Decl. ¶¶ 15–19 [JA 53-55].

Hence, "there is no … doubt that access to additional information about" the
Framework and the Program's other implementing guidelines, "will promote" the

Center's interests and mission. *EDF*, 922 F.3d at 452 (finding "'no reason to doubt' that access to additional information about chemicals manufactured or processed in the United States will promote Environmental Defense's environmental interests, research, and educational activities"). And in the context of a *deprivation of a statutory right to information* under the ESA, this Circuit has not required plaintiffs to allege anything more. *See Friends of Animals I*, 824 F.3d at 1040–1042 (requiring plaintiff, in the context of section 10(c) of the ESA, to only show that "there is no reason to doubt their claim that the information would help them").

Regardless, the harm caused by the Service's nondisclosure is exactly the type of harm Congress sought to protect individuals and groups like the Center from when it promulgated section 4(h). Although section 4(h)'s list of guidelines is non-exhaustive, it explicitly includes "criteria for making the findings … with respect to [listing] petitions[,]" and "a system for developing and implementing … recovery plans…." 16 U.S.C. § 1533(h)(2),(4). The Center regularly submits listing petitions and advocates for the development of recovery plans as part of its mission. Am. Compl. ¶ 12 [JA 10]; *see also* Greenwald Decl. ¶¶ 2, 9–19 [JA 49-50, 51-55]; Lopez Decl. ¶¶ 6–13 [JA 57-59]. By not fully understanding the process by which the Center's petitions are judged, or recovery plans are developed, the Center is harmed.

25

In opposition, the Service argued below that the Center is not harmed because it continues to submit listing petitions and advocate for the development of recovery plans despite the Service's failure. Federal Defs.' Reply in Supp. of Mot. to Dismiss ("Defs.' Reply") at 7 (ECF 20). As if the Center has a choice. However, the Center's persistence in advocating for the protection of imperiled species does not mean that the Service's failure does not harm it. Rather, as it stands, the Center is forced to submit listing petitions and advocate for recovery plans without fully understanding the Program's "underlying policy objectives, terms, criteria, systems, and procedures." Am. Compl. ¶ 14 [JA 11]; Greenwald Decl. ¶¶ 15–19 [JA 53-55]. Just as a persuasive argument could not be made to this Court without knowing the standard of review or other criteria the Court uses to assess the strength of an argument, the lack of information here impairs the Center's ability to effectively advocate for ESA safeguards for both particular species and imperiled species generally. These deficiencies would be addressed and the Center's harm redressed, at least in part, if the district court ordered the Service to provide notice and comment on the Program's implementing guidelines. This potential for relief is enough to establish redressability. *Pub. Citizen*, 491 U.S. at 451 (finding the

potential that a plaintiff "might gain significant relief if they prevail in their suit …

undoubtedly sufficient to give them standing").[8]

The district court also erred when it found that the ESA's primary purpose of

species conservation, with only a "secondary" disclosure requirement, negatively

impacted the informational injury suffered by the Center. ECF 28 at 15–16 [JA 80-

81]. This argument directly conflicts with this Court's holding in *Friends of*

*Animals I*, in which this Court upheld allegations of informational injury pursuant

to section 10(c) of the ESA, 824 F.3d at 1041–42, and also ignores the fact that the

Supreme Court has found that plaintiffs have sufficiently alleged informational

injuries under statutes that have purposes other than simply the disclosure of

information (as opposed to, say, the Freedom of Information Act ("FOIA"). *See*

---

[8] This is also sufficient to answer the question raised in the ruling below regarding
what information the Center could have received from the notice and comment
processes. *See* ECF 28 at 19 [JA 84] (finding that the Center failed to provide
"specific factual allegations" about what the Center would have learned if the
Service had provided, in timely manner, notice and comment on the Framework).
The Center has adequately alleged that the Service's failure to provide the public
with notice of the Framework *when it was being developed* has impaired the
Center's interests in protecting imperiled species. *See, e.g.*, Am. Compl. ¶¶ 14, 50
[JA 11, 19-20]; Greenwald Decl. ¶¶ 15–19 [JA 53-55]. Aside from the fact that it is
impossible to say with more specificity what the Center would have learned from a
process that never took place in the manner required by the ESA, such specificity
is not required at the motion to dismiss stage. Rather, "general factual allegations
of injury resulting from the defendant's conduct may suffice, for on a motion to
dismiss we presum[e] that general allegations embrace those specific facts that are
necessary to support the claim." *Defenders of Wildlife*, 504 U.S. at 561 (internal
quotation marks and citation omitted).

*Akins*, 524 U.S. at 14 (noting that the Federal Election Campaign Act's purpose is to "remedy any actual or perceived corruption of the political process," including by imposing several substantive restrictions on campaign contributions apart from the statute's disclosure requirements); *Pub. Citizen*, 491 U.S. at 445–46 (noting that the Federal Advisory Committee Act "was born of a desire to assess the need for the 'numerous committees, boards, commissions, councils, and similar groups which have been established to advise'" the executive branch, and includes several substantive requirements apart from its disclosure requirements).

The district court similarly erred when it relied on *People for the Ethical Treatment of Animals v. USDA* ("*PETA*"), 797 F.3d 1087 (D.C. Cir. 2015) and *Am. Anti-Vivisection Soc'y v. USDA*, 946 F.3d 615 (D.C. Cir. 2020), to find that the Center's had failed to allege "more than a setback to [the organization's] abstract social interests," and thus failed to sufficiently allege that it had suffered an informational injury. ECF 28 at 18–19 [JA 83-84]. Neither of these cases addressed the showing that must be made when, as here, a plaintiff alleges deprivation of a *right to information required to be made available by statute*. Rather, they addressed organizational standing under the line of precedent established in *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982), which will be addressed in more detail below. *See infra* at III.

28

Therefore, regarding injury in the context of a statutory requirement to make certain information public—as in the *Akins*, *Public Citizen*, and (most squarely on point) *Friends of Animals I* line of cases—there can be no doubt that Congress sought to protect interests such as the Center's which have been harmed by the Service's failure to provide the requisite notice and opportunity for comment on the guidelines implementing section 4 of the ESA as required by section 4(h). The Center need allege nothing more.

**D. The Service's Failure to Provide Notice and Comment on the Species Status Assessment Program's Implementing Guidelines, Including the Framework, Continues to Injure the Center.**

The district court also erred when it found that the Service's failure to provide notice and comment on the Framework does not represent an ongoing injury to the Center's mission and informational interests. ECF 28 at 21–22 [JA 86-87]. As alleged by the Center, the dearth of timely information and confusion surrounding the ongoing use of species status assessments and the guidelines according to which they are developed as a result of the Service's failure to comply with section 4(h) injures the Center anew each time the Service develops and relies on a species status assessment to make decisions pursuant to the ESA. Am. Compl. ¶¶ 9–12, 45–47, 50 [JA 9-10, 18-20].

As Defendants note, "when the Service proposes to list or delist a species, that decision is noticed in the Federal Register along with the accompanying

[species status assessment]." Defs.' Reply at 7. However, the fundamental problem is not the lack of access to specific species status assessments that are relied on in individual listing decisions but the lack of clarity around how they are developed, how (if at all) the interested public may participate in their development, and the lack of notice and an opportunity for input in the process leading up their adoption.

For instance, as explained by Noah Greenwald, the Endangered Species Program Director for the Center, the Framework and the Service's failure to comply with Section 4(h) in its adoption and implementation "has led to considerable confusion about how the public may participate in the development of species-specific [species status assessments], including how protection decisions are made, how public comments are considered during the [species status assessment] process and ultimately how decisions affecting the very survival of species are made." Greenwald Decl. ¶ 2 [JA 49-50]. This confusion has plagued recent decisions based on species status assessments, *id.*s, and there is no reason to believe that it will cease until the Service complies with the ESA by providing notice and comment on the Framework and the Program's other implementing guidelines.

Further, the district court again erred when it faulted the Center for failing to "pinpoint any documents other than the [Framework] that make up the [species status assessment] program" and which the Service failed to provide notice and

30

comment on. ECF 28 at 21 [JA 86]. Not only does this fail to "presum[e] that general allegations embrace those specific facts that are necessary to support the claim," *Defenders of Wildlife*, 504 U.S. at 561, but this also puts the Center in a legal Catch-22: the Center either cannot identify the Program's implementing guidelines because the Service has never provided notice of them, or the Center can identify them because they have become available, not in the Federal Register as required by section 4(h) but as the result of the Center having to affirmatively pursue the information, such as through a FOIA request, Greenwald Decl. ¶¶ 13–14 [JA 53], Lopez Decl. ¶¶ 6–7 [JA 57-58], and the Center's challenge can no longer proceed because it allegedly lacks redressability for the informational injury it suffered. Such circular reasoning cannot immunize the Service from its failure to adhere to Congress's explicit mandate in section 4(h). In any case, the Center has adequately alleged that it is suffering a present and imminent injury as a result of the Service's *ongoing* reliance on the Framework and individual species status assessments without complying with Section 4(h). That is sufficient at this stage of the proceedings. *See Defenders of Wildlife*, 504 U.S. at 561.

31

**E. The Service's Failure to Provide Notice and Comment on the Species Status Assessment Program's Implementing Guidelines Caused the Center's Informational Injury and an Order from this Court Can Redress that Injury.**

The Center's injury was caused by the Service's failure to provide notice and comment on the guidelines by which species status assessments are developed as required by law, and an order from this Court granting injunctive or declaratory relief, or both, would redress the Center's injury, at least in part, by requiring the Service to provide critical information regarding those guidelines and by putting the agency on notice that it is not free to disregard section 4(h)'s clear notice and comment requirements. That the Center's injury is traceable to the Service's failure to provide notice and comment is clear and was not contested below. Thus, the Center will focus on redressability.

The Center's injury will be redressed, at least in part, by an order requiring the Service to provide notice of and an opportunity to comment on the guidelines by which species status assessments are developed, including the Framework.[9] *See Friends of Animals I*, 824 F.3d at 1042 (finding that the injury caused by the

---

[9] To be clear, the Center does not seek injunctive relief halting the Service's interim use of species status assessments while it complies with the ESA's notice and comment requirements. The Center simply seeks an order requiring the agency to publish the Framework and any other guidelines governing the Service's development of species status assessments in the Federal Register and to provide an opportunity for public comment in accordance with section 4(h).

Service's failure to comply with section 10(c) of the ESA was "fairly traceable" to the Federal Defendants "and the alleged injury will be 'redressed by a favorable decision'") (quoting *Defenders of Wildlife*, 504 U.S. at 560–61). As noted above, the Service continues to make species-specific decisions under the Act based on species status assessments developed according to the Framework. *See supra* at I.D. However, due to the continuing lack of published information and confusion surrounding species status assessments, even now, after the Center has been able to acquire a copy of the current version of the Framework following a FOIA request, publication in the Federal Register would better inform the Center about the guidelines by which species status assessments are developed—i.e., their underlying policy objectives, standards, terms, and consequences for species-specific decisions made under the Act—and provide an opportunity to comment on a process which has otherwise been developed and implemented with little transparency and no meaningful public input. *See* Greenwald Decl. ¶¶ 15–19 [JA 53-55]; Lopez Decl. ¶ 13 [JA 59]. Ultimately, this relief will help answer questions concerning species status assessments and help ensure more transparency, predictability, and consistency. This information, in turn, will help the Center carry out its mission to conserve imperiled species by better informing its ability to petition for the addition of species to the list of endangered and threatened species

33

and advocate for robust recovery plans. Am. Compl. ¶¶ 10–12, 51 [JA 9-10, 20];
Greenwald Decl. ¶ 18 [JA 54].

The district court can also redress the Center's injuries by providing
declaratory relief for the Service's violations of section 4(h). The fact that the
Center is now in possession of the Framework does not moot declaratory relief
because such relief may cause the Service to reevaluate and change its practice of
ignoring the requirements of section 4(h) in the future. And this Circuit has found
similar relief sufficient to establish redressability in the context of informational
injury in the past. *See Byrd v. U.S. EPA*, 174 F.3d 239, 244 (D.C. Cir. 1999)
(holding that declaratory relief redressed a plaintiff's informational injuries even
though the information in question had been released because "it will provide him
with this Court's declaration that the agency failed to comply with" the statutory
disclosure provision and such "declaratory relief might well cause [the agency] to
reevaluate and change" it practices to comply with disclosure requirements).

Notably, the Center has alleged that the Service has failed to provide notice
and comment on multiple occasions demonstrating the Service's continual and
impending failure to provide notice and comment on the guidelines informing the
Service's development of species status assessments. *See* Am. Compl. at ¶¶ 44,
48–49 [JA 18, 19] (discussing the Framework, the State Representation on Species
Status Assessment Teams Memorandum, and the subsequent "clarifying"

34

memorandum). As it is clear that the Services has not provided notice and comment on such guidelines in the past, there is no reason to believe that the agency would do so in the future absent declaratory relief.

It is also worthy of note that section 4(h) applies not only to guidelines, but also to "any amendment[s] thereto." 16 U.S.C. § 1533(h). Declaratory relief will therefore ensure the Service publishes any future amendments to the Framework or any of the Program's other implementing guidelines. Thus, in addition to the redress provided by injunctive relief in alleviating the lack of information and clarity around the Program, declaratory relief will help ensure that the Service will no longer ignore its non-discretionary duty to provide notice and comment on section 4's implementing guidelines. *Id.* Therefore, because the Service is the cause of the Center's injury and an order from the district court may alleviate this injury, the Center has adequately alleged Article III standing for its ESA citizen suit claim.

## II.    ALTERNATIVELY, THE SERVICE'S FAILURE TO PROVIDE NOTICE AND COMMENT ON THE SPECIES STATUS ASSESSMENT PROGRAM'S IMPLEMENTING GUIDELINES HAS INFLICTED ORGANIZATIONAL INJURY ON THE CENTER BY DEPRIVING IT OF KEY INFORMATION CRITICAL TO ITS MISSION AND REQUIRING IT TO EXPEND RESOURCES TO COUNTERACT THIS HARM.

The Center clearly has alleged deprivation of a statutory right to information, caused by the Service's failure to provide notice and comment on the

35

Program's implementing guidelines, and this Court can redress that injury. And this Court need not find anything more to reverse the district court and allow this case to proceed to the merits. That being said, the Service's failure has *also* directly adversely affected the Center's discrete programmatic concerns. Specifically, the Service's deprivation of key information that the Center would otherwise rely on to effectively petition for species to be listed as endangered or threatened under the ESA, to advocate for the development of robust, science-based recovery plans, and to inform its members and the public about the Service's implementation of the ESA, injures the Center. In order to attempt to alleviate this injury, the Center has had to use its resources to counteract the harm caused by the Service's failure. That qualifies as injury-in-fact under a distinct line of precedent from the Supreme Court and this Court.

Separate and apart from the injury that flow from deprivation of a *statutory right* to information, which is discussed above and may be suffered by an individual or an organization alike, an organization may *additionally* suffer injury-in-fact if it has "suffered a concrete and demonstrable injury to [its] activities." *PETA*, 797 F.3d at 1093. In order to determine whether an organization has suffered such an injury, courts ask "whether the agency's action or omission to act 'injured the [organization's] interests' and, second, whether the organization 'used

36

its resources to counteract that harm.'" *Id.* at 1094 (quoting *Equal Rights Ctr. v. Post Props.*, 633 F.3d 1136, 1140 (D.C. Cir. 2011)). Both elements are met here.

First, as detailed above, the Service's actions have deprived the Center of "'key information that it relies on' to fulfill its mission," *Am. Anti-Vivisection Soc'y*, 946 F.3d at 619 (quoting *PETA*, 797 F.3d at 1094), in turn harming the Center's organizational interests. This lack of information impacts the Center's ability to effectively petition for the listing of species and to advocate for the development of robust recovery plans. Am Compl. ¶¶ 11–12 [JA 9-10], Greenwald Decl. ¶¶ 1,8 [JA 49, 51]. For example, it harms the Center's ability to understand how the Service now makes species-specific decisions, including in response to petitions submitted by the Center. Am. Compl. ¶ 12 [JA 10]; *see also* Greenwald Decl. ¶ 8 [JA 51] (detailing currently pending petitions).

Second, the Service's failure to provide notice and comment on the Program has impaired the Center's ability to inform and educate its members and the public about the Service's implementation of the ESA. Am. Compl. ¶ 13 [JA 10-11]; *see Friends of Animals v. Bernhardt*, 961 F.3d 1197 (D.C. Cir. 2020) (noting that allegations that an agency's actions negatively impact an "organization's educational work 'to have up to date information' on the Service's policies[,]" sufficiently establishes standing at the motion to dismiss stage). These injuries are far more than mere setbacks to the Center's social interests or the Center's

"lobbying activities." *Ams. For Safe Access v. DEA*, 706 F.3d 438, 457 (D.C. Cir. 2013). Rather, they go to the heart of the Center's mission to protect imperiled species.

Additionally, the Center has expended and will be forced to continue expend resources in response to the Service's failure. For instance, due to the lack of notice, the Center submitted multiple FOIA requests seeking information regarding the Program and dedicated a significant amount of staff time in an attempt to understand the Program and how it might affect the Center's mission. Am. Compl. ¶ 11 [JA 9-10], Greenwald Decl. ¶¶ 13–15 [JA 53-54]; Lopez Decl. ¶ 8 [JA 58]. These resources do not concern a "diversion of resources to litigation or to investigation in anticipation of litigation." *Am. Soc. For Prevention of Cruelty to Animals v. Feld Entm't Inc.*, 659 F.3d 13, 25 (D.C. Cir. 2011). Rather, the Center was forced to undertake them completely independent from this suit. As such, the Service's failure has "injured the [Center's] interests" and the Center has been forced to "use[] its resources to counteract that harm.'" *PETA*, 797 F.3d at 1093 (quoting *Equal Rights Ctr.*, 633 F.3d at 1140). Since the district court can redress this injury by ordering the Service to provide notice and comment on the Program's implementing guidelines or through declaratory relief, the Center has organizational standing.

### III. THE CENTER'S ESA CITIZEN SUIT CLAIM CHALLENGES A DISCRETE, NON-DISCRETIONARY DUTY THAT THE SERVICE FAILED TO TAKE.

The Center's sole claim on appeal brought pursuant to the ESA's citizen suit provision, 16 U.S.C. § 1540(g)(1)(C), challenges the Service's failure to perform its discrete, non-discretionary duty under section 4(h), *id.* § 1533(h); specifically to provide to the public notice and an opportunity to comment on the guidelines by which species status assessments are generated. *See* Am. Compl. ¶¶ 52–56 [JA 20-21]. The ESA's citizen suit provision, 16 U.S.C. § 1540(g)(1)(C), establishes a cause of action for the Service's failure to carry out a nondiscretionary duty,[10] and vests jurisdiction in this Court "to order the Secretary to perform such act or duty." *Id.* § 1540(g)(1)(c); *Bennett*, 520 U.S. at 172 (noting that the Service's "omission of [a statutorily] required procedure[]" is reviewable under section 11(g)(1)(C)). Consequently, the Center's claim that the Service has failed, and is continuing to

---

[10] While section 11(g)(1)(C) largely parallels section 706(1) of the APA, which authorizes a reviewing court to "compel agency action unlawfully withheld," 5 U.S.C. § 706(1), the Center's claim is properly analyzed under the ESA because section 11(g)(1)(C) expressly "provides a private cause of action." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 61–62 (2004); *see also Bowen v. Mass.*, 487 U.S. 879, 903 (1988) ("Congress did not intend the general grant of review in the APA to duplicate existing procedures for review of agency action."); *Coos Cnty. Bd. of Cnty. Comm'rs v. Kempthorne*, 531 F.3d 792, 810 (9th Cir. 2008) (precluding APA cause of action "because [section 706(1)] is identical in all relevant respects to the ESA cause of action," which provided an "adequate remedy").

fail, to perform its nondiscretionary duty to publish "guidelines" in the manner

mandated by the ESA falls squarely within the ESA's citizen suit provision. Thus,

despite the district court's suggestion to the contrary, *see* ECF 28 at 26 n.15 [JA

91], the APA's final agency action requirement, *see* 5 U.S.C. § 704, does not bar

the Center's claim.[11]

      As explained above, the Service's section 4(h) duty is discrete and non-

discretionary. 16 U.S.C. § 1533(h). "Section 4(h)'s language is mandatory, not

permissive." *See* ECF 28 at 13 [JA 78]. Specifically, section 4(h) states that the

Service "shall provide" notice and comment on "any guideline" that it proposes to

establish "to insure that the purposes of [section 4] are achieved efficiently and

effectively." 16 U.S.C. § 1533(h). The ESA's citizen suit provision, in turn, makes

the Service's failure to perform that duty imposed by section 4(h) directly

reviewable in the district court. *See id.* § 1540(g)(1)(C) ("[A]ny person may

commence a civil suit on his own behalf … against the Secretary where there is

---

[11] The district court stopped short of definitively resolving whether the Center was required to allege final agency action as a precondition to judicial review of an ESA citizen suit claim. *See* ECF 28 at 26 n.15 [JA 91]. Because this is a purely legal issue subject to *de novo* review, the Center respectfully requests that this Court exercise its authority to decide the issue on appeal. *See Friends of Blackwater v. Salazar*, 691 F.3d 428, 432, 436 (D.C. Cir. 2012) (resolving purely legal issue of whether the Service's interpretation of section 4(a)(1)(D) was reasonable in a challenge to a delisting decision, which the district court raised in a footnote, but did not decide), *rev'g,* 772 F. Supp. 2d 232, 245 n.17 (D.D.C. 2011).

40

alleged a failure of the Secretary to perform any act or duty under section 4 which is not discretionary with the Secretary."); *id.* ("The district courts shall have jurisdiction … to order the Secretary to perform such act or duty….").

In this case, the discrete agency action that section 11(g)(1)(C), 16 U.S.C. § 1540(g)(1)(C), makes reviewable is the Service's failure to provide notice and comment on the guidelines by which species status assessments are developed. The Center's claim does not substantively challenge the underlying guidelines themselves. And, where, as here, "an agency is under an unequivocal statutory duty to act, failure so to act constitutes, in effect, an affirmative act that triggers 'final agency action' review." *Sierra Club v. Thomas*, 828 F.2d 783, 793 (D.C. Cir. 1987), *abrogated on other grounds by* Clean Air Act Amendments, Pub. L. No. 101-549, § 707(f), 104 Stat. 2399, 2683 (1990). Otherwise, "agencies could effectively prevent judicial review of their policy determinations by simply refusing to take final action," as the Service has attempted to do so here. *Cobell v. Norton*, 240 F.3d 1081, 1095 (D.C. Cir. 2001).

Notwithstanding the above, the district court suggested that only final agency action is reviewable because the ESA "contains 'no statutory review provision … that authorizes judicial review of agency action beyond that provided for in the APA.'" ECF 28 at 26 n.15 [JA 91] (quoting *Nat'l Ass'n of Home Builders v. Norton* ("*Home Builders*"), 415 F.3d 8, 13 (D.C. Cir. 2005). *Home*

41

*Builders*, however, cannot foreclose the Center's failure-to-act claim because it is clearly distinguishable.

The plaintiffs in *Home Builders* alleged that the Service violated APA section 553, 5 U.S.C. § 553, and ESA section 4(b)(4), 16 U.S.C. § 1533(b)(4), by failing to provide notice and comment when it promulgated certain survey protocols for the endangered quino checkerspot butterfly. *Home Builders*, 415 F.3d at 12. But because the Service's duty under section 4(b)(4), 16 U.S.C. § 1533(b)(4), expressly applies to "*regulation[s]*," the question of whether the survey protocols constituted final agency action was central to the court's disposition of the motion for summary judgment in that case.

In contrast to the provision at issue in *Home Builders*, section 4(h) specifically requires public notice and comment for any "*guideline*"—not "regulation"—that the Service proposes to establish to achieve section 4's purposes. *Id.* § 1533(h). Definitionally, "guidelines" need not be binding on agencies (or others) in the same manner as regulations or comparable final agency actions that are reviewable under the APA as such. *Guideline*, merriam-webster.com, https://www.merriam-webster.com/dictionary/guideline (last visited August 3, 2020). Therefore, if, as the Center maintains, the guidelines governing species status assessments are covered by the mandatory publication duty imposed by section 4(h), the Center may pursue an ESA claim on that basis irrespective of

42

whether the guidelines also qualify as final regulations, the sole question that was before the Court in *Home Builders*.

At the motion dismiss stage, the pertinent inquiry is whether the Center has adequately alleged that the Service failed to perform a discrete, non-discretionary duty under the ESA. The Center's claim does just that—it challenges the Service's failure to act. Nothing in *Home Builders* or any other Circuit precedent forecloses review of that claim. Accordingly, this suit must be allowed to proceed to summary judgment and the district court's grant of the Service's motion to dismiss must be reversed.

## CONCLUSION

For these reasons, this Court should reverse the district court and remand for proceedings on the merits.


DATED: August 3, 2020                Respectfully submitted,

                                     */s/ Ryan Adair Shannon*
                                     Ryan Adair Shannon
                                     D.C. Bar No. OR OR0007
                                     CENTER FOR BIOLOGICAL DIVERSITY
                                     P.O. Box 11374
                                     Portland, OR 97211
                                     T: 503.283.5475 ext. 407
                                     F: 503.283.5528
                                     E: rshannon@biologicaldiversity.org

Amy R. Atwood
D.C. Bar No. 470258
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 11374
Portland, OR 97211-0374
T: 971.717.6401
E: atwood@biologicaldiversity.org

*Attorneys for Plaintiff*

44

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

This document complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 11,227 words.

This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

*/s/ Ryan Adair Shannon*
Ryan Adair Shannon
D.C. Bar No. OR OR0007
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 11374
Portland, OR 97211
T: 503.283.5475 ext. 407
F: 503.283.5528
E: rshannon@biologicaldiversity.org

# CERTIFICATE OF SERVICE

I hereby certify that the foregoing document was served on all counsel of record in Case No. 20-5088 through the electronic filing system (CM/ECF) of the U.S. Court of Appeals for the District of Columbia Circuit.

*/s/ Ryan Adair Shannon*
Ryan Adair Shannon
D.C. Bar No. OR OR0007
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 11374
Portland, OR 97211
T: 503.283.5475 ext. 407
F: 503.283.5528
E: rshannon@biologicaldiversity.org

**ORAL ARGUMENT SCHEDULED FOR JANUARY 11, 2021**
**No. 20-5088**

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

CENTER FOR BIOLOGICAL DIVERSITY,

*Plaintiff-Appellant*,

v.

DAVID BERNHARDT, DEPARTMENT OF THE INTERIOR,
AURELIA SKIPWITH, and
UNITED STATES FISH AND WILDLIFE SERVICE,

*Defendants-Appellees*.

On Appeal from the United States District Court
for the District of Columbia Case No. 1:18-cv-02576-RC

**ADDENDUM TO PLAINTIFF-APPELLANT'S FINAL OPENING BRIEF**

Ryan Shannon
Telephone: (971) 717-6407
rshannon@biologicaldiversity.org
Center for Biological Diversity
P.O. Box 11374
Portland, OR 97211

Amy Atwood
Telephone: (971) 717-6401
atwood@biologicaldiversity.org
Center for Biological Diversity
P.O. Box 11374
Portland, OR 97211

*Attorneys for Plaintiff-Appellant*

**Endangered Species Act, Section 4(a)(1): 16 U.S.C. § 1533(a)(1):**

(a) Generally. (1) The Secretary shall by regulation promulgated in accordance with subsection (b) [16 U.S.C. § 1533(b)] determine whether any species is an endangered species or a threatened species because of any of the following factors:

> (A) the present or threatened destruction, modification, or curtailment of its habitat or range;
> (B) overutilization for commercial, recreational, scientific, or educational purposes;
> (C) disease or predation;
> (D) the inadequacy of existing regulatory mechanisms; or
> (E) other natural or manmade factors affecting its continued existence.

**Endangered Species Act, Section 4(b)(3): 16 U.S.C. § 1533(b)(3): Basis for determinations.**

(3)(A) To the maximum extent practicable, within 90 days after receiving the petition of an interested person under section 553(e) of title 5, United States Code [5 USCS § 553(e)], to add a species to, or to remove a species from, either of the lists published under subsection (c), the Secretary shall make a finding as to whether the petition presents substantial scientific or commercial information indicating that the petitioned action may be warranted. If such a petition is found to present such information, the Secretary shall promptly commence a review of the status of the species concerned. The Secretary shall promptly publish each finding made under this subparagraph in the Federal Register.

(B) Within 12 months after receiving a petition that is found under subparagraph (A) to present substantial information indicating that the petitioned action may be warranted, the Secretary shall make one of the following findings:

> (i) The petitioned action is not warranted, in which case the Secretary shall promptly publish such finding in the Federal Register.
> (ii) The petitioned action is warranted, in which case the Secretary shall promptly publish in the Federal Register a general notice and the complete text of a proposed regulation to implement such action in accordance with paragraph (5).
> (iii) The petitioned action is warranted, but that—
>> (I) the immediate proposal and timely promulgation of a final regulation implementing the petitioned action in accordance with paragraphs (5) and (6) is precluded by pending proposals to determine

whether any species is an endangered species or a threatened species, and

(II) expeditious progress is being made to add qualified species to either of the lists published under subsection (c) and to remove from such lists species for which the protections of the Act are no longer necessary,

in which case the Secretary shall promptly publish such finding in the Federal Register, together with a description and evaluation of the reasons and data on which the finding is based.

(C)

(i) A petition with respect to which a finding is made under subparagraph (B)(iii) shall be treated as a petition that is resubmitted to the Secretary under subparagraph (A) on the date of such finding and that presents substantial scientific or commercial information that the petitioned action may be warranted.

(ii) Any negative finding described in subparagraph (A) and any finding described in subparagraph (B)(i) or (iii) shall be subject to judicial review.

(iii) The Secretary shall implement a system to monitor effectively the status of all species with respect to which a finding is made under subparagraph (B)(iii) and shall make prompt use of the authority under paragraph 7 [(7)] to prevent a significant risk to the well being of any such species.

(D)

(i) To the maximum extent practicable, within 90 days after receiving the petition of an interested person under section 553(e) of title 5, United States Code [5 USCS § 553(e)], to revise a critical habitat designation, the Secretary shall make a finding as to whether the petition presents substantial scientific information indicating that the revision may be warranted. The Secretary shall promptly publish such finding in the Federal Register.

(ii) Within 12 months after receiving a petition that is found under clause (i) to present substantial information indicating that the requested revision may be warranted, the Secretary shall determine how he intends to proceed with the requested revision, and shall promptly publish notice of such intention in the Federal Register.


**Endangered Species Act, Section 4(f): 16 U.S.C. § 1533(f): Recovery plans.**

(1) The Secretary shall develop and implement plans (hereinafter in this subsection referred to as "recovery plans") for the conservation and survival of endangered species and threatened species listed pursuant to this section, unless he finds that such a plan will not promote the conservation of the species. The Secretary, in

developing and implementing recovery plans, shall, to the maximum extent practicable—

> (A) give priority to those endangered species or threatened species, without regard to taxonomic classification, that are most likely to benefit from such plans, particularly those species that are, or may be, in conflict with construction or other development projects or other forms of economic activity;

> (B) incorporate in each plan—

>> (i) a description of such site-specific management actions as may be necessary to achieve the plan's goal for the conservation and survival of the species;

>> (ii) objective, measurable criteria which, when met, would result in a determination, in accordance with the provisions of this section, that the species be removed from the list; and

>> (iii) estimates of the time required and the cost to carry out those measures needed to achieve the plan's goal and to achieve intermediate steps toward that goal.

(2) The Secretary, in developing and implementing recovery plans, may procure the services of appropriate public and private agencies and institutions, and other qualified persons. Recovery teams appointed pursuant to this subsection shall not be subject to the Federal Advisory Committee Act [5 USCS Appx.].

(3) The Secretary shall report every two years to the Committee on Environment and Public Works of the Senate and the Committee on Merchant Marine and Fisheries of the House of Representatives on the status of efforts to develop and implement recovery plans for all species listed pursuant to this section and on the status of all species for which such plans have been developed.

(4) The Secretary shall, prior to final approval of a new or revised recovery plan, provide public notice and an opportunity for public review and comment on such plan. The Secretary shall consider all information presented during the public comment period prior to approval of the plan.

(5) Each Federal agency shall, prior to implementation of a new or revised recovery plan, consider all information presented during the public comment period under paragraph (4).

**Endangered Species Act, Section 4(h): 16 U.S.C. § 1533(h): Agency guidelines; publication in Federal Register; scope; proposals and amendments: notice and opportunity for comments.**

The Secretary shall establish, and publish in the Federal Register, agency guidelines to insure that the purposes of this section are achieved efficiently and effectively. Such guidelines shall include, but are not limited to—

   (1) procedures for recording the receipt and the disposition of petitions submitted under subsection (b)(3) of this section;
   (2) criteria for making the findings required under such subsection with respect to petitions;
   (3) a ranking system to assist in the identification of species that should receive priority review under subsection (a)(1) of this section; and
   (4) a system for developing and implementing, on a priority basis, recovery plans under subsection (f) of this section.

The Secretary shall provide to the public notice of, and opportunity to submit written comments on, any guideline (including any amendment thereto) proposed to be established under this subsection.

**Endangered Species Act, Section 11(g)(1)(C): 16 U.S.C. § 1540(g)(1)(C): Citizen suits.**

(1) Except as provided in paragraph (2) of this subsection any person may commence a civil suit on his own behalf—

…

(C) against the Secretary where there is alleged a failure of the Secretary to perform any act or duty under section 4 [16 USCS § 1533] which is not discretionary with the Secretary.

The district courts shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties, to enforce any such provision or regulation, or to order the Secretary to perform such act or duty, as the case may be….